# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) EMRICH AERIAL SPRAYING LLC,

     Plaintiff,

vs.

(1) THE CITY OF PAWHUSKA, a municipal corporation, (2) PAWHUSKA MUNICIPAL AIRPORT AUTHORITY, and (3) PAWHUSKA MUNICIPAL AIRPORT ADVISORY COMMITTEE

     Defendants.

Case No.:  25-cv-00115-SH

JURY TRIAL DEMANDED

## **COMPLAINT**

COMES NOW Emrich Aerial Spraying LLC ("EAS" or "Plaintiff") and for its claims against the City of Pawhuska, Oklahoma, the Pawhuska Municipal Airport Authority, and the Pawhuska Municipal Airport Advisory Committee (collectively "the City") hereby alleges and states the following:

## I.    PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff EAS is a Nebraska limited liability company with its principal place of business in Nebraska. EAS is licensed to do business in the State of Oklahoma as a foreign limited liability company. EAS is engaged in the business of agricultural spraying services. At all times relevant to the claims asserted herein, EAS was a Nebraska resident.

2.    The City of Pawhuska, Oklahoma is a municipality in Oklahoma and, therefore, a citizen of Oklahoma (the "City").

3.    The Pawhuska Municipal Airport Authority is a citizen of Oklahoma operating the Pawhuska Airport in Pawhuska, Oklahoma.

4.     The Pawhuska Municipal Airport Advisory Committee is a citizen of Oklahoma providing recommendations on the management of the Pawhuska Airport.

5.     Pawhuska Airport is owned by the City. Members of the City Council also serve as members of the Pawhuska Municipal Airport Authority. The Pawhuska Airport is located at the E/2 SE/4 NE/4 of Section 2, Township 25 North, Range 8 East, Osage County, Oklahoma.

6.     Jurisdiction is proper in this Court pursuant to 28 U.S. § 1331 because some of EAS' claims arise under federal law, including for violations of the Sherman Act, 15 U.S.C. § 2, and EAS' civil rights under 42 U.S.C. § 1983. This Court has supplemental jurisdiction over all other claims asserted herein pursuant to 28 U.S.C. § 1367(a).

7.     Most, if not all, of the acts giving rise to this dispute occurred in and/or around Pawhuska, Oklahoma located in Osage County, Oklahoma. The contracts underlying multiple of EAS' claims were executed in and/or around Pawhuska, Oklahoma. Accordingly, venue is proper in this Court.

## II.     BACKGROUND AND FACTS

8.     EAS was formed by Mr. Ragnar Emrich and his brother, Thayne Emrich.

9.     EAS is an agricultural spraying service. EAS contracts with rural farmers and ranchers to sell and apply various products, including fertilizers and pesticides, to farmers' and/or ranchers' property during key timeframes each year.

10.     EAS owned and operated several agricultural spraying airplanes in Nebraska.

11.    In 2015, EAS sought to expand its business into Oklahoma and began the process of partnering with Bluestem Aerial ("Bluestem") in Pawhuska, Oklahoma. Bluestem was owned and operated by Kevin Brown.

12.    Upon his passing in July 2016, Mrs. Angela Emrich received her late husband, Ragnar Emrich's, partial interest in EAS. Thayne Emrich transferred his interest to Angela Emrich in December 2017.

13.    Angela Emrich has been the sole owner and operator of EAS since December 2017.

First Agreement

14.    In March 2019, Kevin Brown informed EAS that Bluestem would not be partnering with EAS, but would instead be sold to Heinen Brothers, a competitor of EAS.

15.    Upon information and belief, the terms of Mr. Brown's sale of Bluestem to the Heinen Brothers included an ongoing royalty payment – a percentage of future profits – to Mr. Brown.

16.    In April 2019, EAS began negotiating an agreement with the City to utilize the Pawhuska Airport for commercial operation, acquired equipment, and invested resources to expand operations into the area surrounding the Pawhuska Airport. An aerial view of the Pawhuska Airport is shown below:



(Google Maps accessed March 6, 2025)

17.    In Osage County, the agricultural spraying sale season runs approximately March 1 to April 30. The spraying season begins approximately May 1 and continues until approximately July 4 each year.

18.    In light of the significant resources EAS had already invested in expanding its business into the area surrounding Pawhuska Airport and despite Bluestem's sale to the Heinen Brothers, EAS continued its negotiations with the City and the Pawhuska Municipal Airport Authority.

19.    On April 26, 2019, EAS and the City entered into an *Aerial Applicator Agreement*, attached hereto as Exhibit 1 (the "First Agreement").

20.    While the First Agreement speaks for itself, it permitted EAS to use the Pawhuska Airport in connection with its aerial application and crop-dusting business. *See* Ex. 1.

21.    In addition, the First Agreement permitted EAS to begin operations for the calendar year of 2019. *See id.*

22.    Pursuant to the First Agreement, EAS held, among other rights, the following contractual rights:

    a.    Use the "150 feet x 150 feet area located next to the tarmac area north of the north hangers at the airport (together with ingress and egress over and across the runway and access roads of the Pawhuska Airport) in connection with its aerial application business."

    b.    "[U]se of a space for a self-contained loading trailer along the fence between the blue office building and the north hangers [of the Pawhuska Airport]…"

    c.    "[N]on-exclusive right to use the blue office building during daily operations under the conditions that the building shall continue to be available to the public…"

    d.    The right to use water associated with the City's water accounts until EAS could install its own connections to the rural water supplier in the area.

23.    The anniversary date of the First Agreement was April 26.

24.    The First Agreement provided, in part, as follows:

The term of this Agreement shall be for the calendar year of 2019 and shall be automatically renewed for two (2) consecutive one (1) year terms unless either party gives written notice of its intent not to renew within **sixty** (60) days prior of the anniversary date of the agreement.

*See* Ex. 1, at ¶1 (emphasis added).

25.     At all relevant times, EAS performed its obligations and duties under the First Agreement, including payment of required payments, fees and/or expenses, and maintained required insurance policies.

26.     Beginning in or about April 2019, the City continuously denied EAS access to facilities at Pawhuska Airport as required by the First Agreement.

27.     Beginning in or about April 2019, upon information and belief, the City acted with the intention of prohibiting EAS from conducting its aerial spraying operations as permitted by the First Agreement.

28.     In or around April 2019, the City informed EAS at a City Council meeting that, if it wished to operate at the Pawhuska Airport, EAS would need to construct a building on the property at its own expense. EAS and the City agreed to discuss terms after the 2019 spray season.

29.     In May 2019, the City:

    a.  Placed a new keypad on the "blue office building" and instructed EAS to use the keypad for access.

    b.  Instructed EAS that it is no longer permitted to use the water hydrants associated with the City's water accounts at the Pawhuska Airport.

30.     However, the City's blockade of the water hydrants at Pawhuska Airport were limited to EAS. Indeed, upon information and belief, the City permitted other commercial operators to utilize the water hydrants at Pawhuska Airport.

31.     Upon information and belief, those commercial operators were competitors of EAS, Bluestem and Deterding Aerial.

32.     After EAS demanded the City comply with its obligations under the First Agreement, the City reassured EAS that the City would honor its obligation under the First Agreement.

33.     In and around fall 2019, EAS and the City, via City Manager Dave Neely, began negotiations for EAS to construct a hangar on the Pawhuska Airport property at its own expense, to be owned by the City and leased back to EAS for appropriate consideration.

34.     During these negotiations, EAS made the City aware that conducting its operations using other airports, further from its Pawhuska clientele, was incredibly inefficient, burdensome, and costly for EAS.

35.     In May 2020, the City had removed its lock from the City water hydrants at Pawhuska Airport, so EAS again began using the City's water pursuant to the First Agreement.

36.     In response, the City actively sought to stop EAS' operations at the Pawhuska Airport.

37.     In May 2020, EAS received notice, for the first time, that the City had unsuccessfully attempted to terminate the First Agreement. Later, EAS would discover that on March 10, 2020, the City placed a letter dated February 18, 2020, in the mail to EAS purporting to terminate the First Agreement as of April 26, 2020.

38.     However, the City's letter was never delivered to EAS. Instead, the letter was returned to the City and delivered a second time to EAS' Nebraska residence. *See* Correspondence, Postmarked March 10, 2020, attached hereto as Exhibit 2.

39.    Ultimately, EAS did not receive timely notice of the City's attempt to terminate the First Agreement, nor had the City actually attempted to mail the notice before its deadline to terminate the First Agreement before the 2020 spraying season.

40.    On May 21, 2020, the City Attorney for the City, Mr. John Heskett, informed EAS through EAS's then-counsel that "the City Manager does not want to harm [EAS] by refusing to allow [it] to use the Airport for the [2020] season." However, contrary to the terms of the First Agreement, "[n]o further use of the water hydrants or water systems at the Airport will be allowed." Mr. Heskett's letter is attached hereto as Exhibit 3.

41.    The same letter indicated that the City was terminating the agreement for future spraying seasons. *Id*.

42.    In July 2020, at a City Council meeting, the City gave Bluestem permission to construct an additional hangar at the Pawhuska Airport. At the same City Council meeting, Councilman Roger Taylor stated that EAS would also be allowed to construct a hangar under the same conditions as Bluestem. Specifically, like Bluestem, EAS would need to fund the construction of its hangar.

43.    In and around mid-2021, the City demanded EAS to remove its loading trailer from the Pawhuska Airport. EAS promptly complied. The City filed a lawsuit after the trailer had been removed and subsequently dismissed that lawsuit.

44.    In the fall of 2021, EAS hired a third-party consulting firm to aid in its dealing with the City and help obtain permission from the City to construct a hangar at Pawhuska Airport.

45.    In and around the fall of 2021, the City promised again to move forward with an agreement with EAS to build a hangar.

46.    On November 16, 2021, EAS submitted a formal proposal to the City and Municipal Airport Authority to build a hangar at the Pawhuska Airport at its own expense.

47.    On December 13, 2021, EAS' proposal was approved by the Municipal Airport Authority. Mr. Hank Benson, a member of the Municipal Airport Authority, informed EAS that he would submit the recommendation to the City Counsel at the December 14, 2021, City Council meeting.

48.    However, upon information and belief, Mr. Benson did not appear at the December 14, 2021, City Council meeting in an attempt to avoid presenting EAS' approved proposal. Fortunately, EAS presented its proposal to the City Council. City Councilmembers Roger Taylor and Mark Buchannan, who also served on the Municipal Airport Authority, reported the Municipal Airport Authority's prior approval. The City Council then selected a designee to work with EAS on the final terms of a lease agreement.

49.     Contrary to statements by EAS and other members of the Municipal Airport Authority, Mr. Benson later denied that the Municipal Airport Authority approved EAS's proposal.

50.    In and around February 2022, the City provided a site plan offer to EAS, which offered considerably less acreage to EAS than has been allowed to its competitors and was not feasible for operations. The site plan is attached hereto as Exhibit 4.

<u>Second Agreement</u>

9

51.    On March 31, 2023, the City and EAS finally entered into an Airport Hangar Lease (the "Second Agreement" attached hereto as Exhibit 5) authorizing, among other things, EAS to erect upon Pawhuska Airport property "certain structure and improvements commonly referred to as an aircraft hangar and chemical storage shed (the 'Buildings')".

52.    The Second Agreement specifically permits the Buildings to be used for the housing and storage of aircraft and herbicides, pesticides, and other chemicals used in the normal operations of aerial agricultural chemical application business. *Id*.

53.    However, since the execution of the Second Agreement nearly two years ago, the City has failed to meet its obligations under the Second Agreement, which provides that "the City Manager shall work with the Airport Engineer to develop and describe the boundaries for the site to be used and location, along with the provisions and description for proper access to the Real Property…"

54.    To no avail, EAS continued to notify the City throughout 2023 that no representative of the City has been in contact with EAS regarding the site plan.

55.    In and around April 2024, EAS received a letter from Mr. Benson stating that "[i]t has come to our attention that the "Airport Hangar Lease" dated March 31, 2023, is in breach of contract on item #6." Mr. Benson's letter is attached hereto as Exhibit 6.

56.    In a subsequent telephone conversation with EAS' counsel, the City Attorney, Mr. Heskett, retracted Mr. Benson's statement, clarifying that EAS was not in breach of the Second Agreement.

57.     On May 7, 2024, at an Municipal Airport Authority meeting, Mr. Benson again stated on behalf of the Municipal Airport Authority that EAS was in breach of the Second Agreement.

58.     The City Attorney, however, confirmed again via email on May 28, 2024, that EAS was not in breach of the Second Agreement. That email is attached hereto as Exhibit 7.

59.     To date, EAS is still waiting on the City to complete its obligations under the Second Agreement so that EAS may begin constructing the Buildings at the Pawhuska Airport.

60.     The City has continued to make promises to EAS that it will fulfill those obligations but has not done so.

61.     EAS has relied on each of those promises when conducting its business and, attempted to, and in some cases, continued to make agreements with the farmers and ranchers in the Pawhuska area. Yet, each time, EAS has suffered the additional costs and expenses of operating at an unnecessary distance from Pawhuska.

62.     Additionally, EAS has had to forgo otherwise profitable contracts with Pawhuska area ranches because they have not been allowed the same access as their competitors.

## The City's Anticompetitive Acts

63.     In the time since EAS' initial request was submitted, the City has since approved other competitors of EAS to build upon and access the Pawhuska Airport property for their businesses.

64.     Upon information and belief, the City and Municipal Airport Authority have intentionally and willfully excluded EAS from competition in the agricultural spraying services industry in Pawhuska by limiting its access to the Pawhuska Airport and its resources, while granting such access to its competitors. Along these lines, the City and Municipal Airport Authority have: (a) imposed demands upon EAS that have not been imposed upon EAS' competitors; and (b) imposed obstacles to EAS' access that have not been imposed upon EAS' competitors.

65.     Upon information and belief, the City has received federal funds for the development of the Pawhuska Airport and is subject to 49 U.S.C. § 47107.

66.     Further, pursuant to 49 U.S.C. § 47107, the City is obligated to adhere to the Federal Aviation Administration's Grant Assurances, which specifically include the following:

> "It will make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport." Section 22(a) of the Grant Assurances

> "It will permit no exclusive right for the use of the airport by any person providing, or intending to provide, aeronautical services to the public." Section 23 of the Grant Assurances

> "If the airport owner or operator and a person who owns an aircraft agree that a hangar is to be constructed at the airport for the aircraft at the aircraft owner's expense, the airport owner or operator will grant to the aircraft owner for the hangar a long term lease that is subject to such terms and conditions on the hangar as the airport owner or operator may impose." Section 38 of the Grant Assurances

67.     The City and Pawhuska Municipal Airport Authority, by refusing EAS the same access to the Airport and its resources that it allows EAS's competitors (including

Bluestem Aerial and Deterding Aerial), have violated at least the above provisions of the Grant Provisions.

68.     This has resulted, and will continue to result, in unnecessary increased costs and expenses to EAS. However, in addition to the increased fuel expenses and the cost for pilot time, the situation creates a compounding issue and a substantial inefficiency for EAS, namely that because more fuel is required onboard, there is less room for the actual agriculture products to be sprayed on the clients' property. This has, and will continue to, cause EAS make multiple trips to reload its products and then return to the clients' property near the Pawhuska airport.

69.     EAS has also been caused to forgo otherwise profitable contracts with Pawhuska area ranches because they have not been allowed the same access as their competitors.

70.     Such harms are reasonably foreseeable to the City, who was notified of the same during the earliest negotiations to build a hangar in the fall of 2019. Such harms were intentional and with malice.

71.     The City's conduct has injured competition in the agricultural spray industry in the Pawhuska (and surrounding) market by causing EAS to incur significantly more expenses to compete for customers.

72.     The City acted with malice and reckless disregard for the contractual and civil rights of EAS.

73.     The City acted in bad faith with respect to its obligations, and the rights of EAS, under the First Agreement and Second Agreement.

74.    The City created issues and/or obstacles effectively precluding EAS from participating in the Pawhuska aerial spraying market. To this end, at key times of the year, the City acted, or in some cases, failed to act so as to create doubt regarding EAS' ability to: (1) access the airport for any given spraying season; and (2) enter, perform and/or fulfill spraying contracts with Pawhuska area customers, and specifically large Pawhuska area farms and/or ranches.

75.    For all intents and purposes, the City has acted in a way to effectively deny EAS the opportunity to market its services in the Pawhuska market during the spray sale season and/or the spray season, i.e. to deprive EAS the opportunity to enter into contracts with Pawhuska area customers and otherwise tip the scales in favor of EAS' competitors.

## III.    CAUSES OF ACTION

**COUNT I**
**Violations of the Sherman Act, 15 U.S.C. § 2**

76.    EAS repleads and incorporates in full paragraphs 1–75 above.

77.    By engaging in the aforementioned exclusionary acts and practices, the City has used monopolistic authority over the airport and its resources to injure competition in the relevant product markets of aeronautical spraying services in the relevant geographic market.

78.    The City has acted with specific intent in using control of an essential facility, the airport and its resources, to limit competition within the agricultural spraying services industry and within the relevant geographic market.

79.     As described above, the City's conduct involves and affects interstate commerce in that Plaintiff is not an Oklahoma business, its assets travel across state lines for its services in Oklahoma, and several of the products it uses in Pawhuska originate outside of Oklahoma but are brought here for use.

80.     As a proximate and consequent result of the City's pattern of unlawful behavior, EAS has been injured in its business and property in that:

    a.  It has lost and continues to lose profits which it would have made but for the City's actions;

    b.  It has lost and continues to lose business goodwill;

    c.  It has suffered and will continue to suffer diminution in its going-concern values; and

    d.  Its ability to serve its customers has been impaired.

### COUNT II
### Violations of the Oklahoma Antitrust Reform Act, 79 Okla. Stat. § 203(B)

81.     EAS repleads and incorporates in full paragraphs 1–80 above.

82.     The City has acted with specific intent of using control of an essential facility, the airport and its resources, to limit competition within the agricultural spraying services industry and within the relevant geographic market in violation of the Oklahoma Antitrust Reform Act, 79 Okla. Stat. § 203(B)

83.     As a proximate and consequent result of the City's pattern of unlawful behavior, EAS has been injured in its business and property in that:

a.  It has lost and continues to lose profits which it would have made but for the City's actions;

b.  It has lost and continues to lose business goodwill;

c.  It has suffered and will continue to suffer diminution in its going-concern values; and

d.  Its ability to serve its customers has been impaired.

### COUNT III

### Violations of EAS' Civil Rights under 42 U.S.C. § 1983

84.     EAS repleads and incorporates in full paragraphs 1–83 above.

85.     Pursuant to 49 U.S.C. § 47107 and at least § 22, § 23, and § 38 of the Grant Assurances, EAS is guaranteed the right to equal and fair opportunity to use the Pawhuska Airport and its resources.

86.     On multiple occasions since 2019, the City and the Pawhuska Municipal Airport Authority have failed to comply with the Oklahoma Open Meetings Act, specifically, obligations regarding notice, when issues to be addressed concern EAS, the First Agreement, the Second Agreement, or aerial spraying operations at the Pawhuska Airport.

87.     The City, by and through its pattern of targeted exclusion and discrimination against EAS, has violated those guaranteed rights.

88.     The City, through its abject refusal to permit EAS despite the Second Agreement to construct a hangar at the Pawhuska Airport, has violated those guaranteed rights.

89.    The City, by and through its pattern of targeted exclusion and discrimination against EAS, has denied EAS its right to lawfully compete in the agricultural spraying services industry in Pawhuska.

90.    Although mitigated to the fullest reasonable extent, EAS has suffered damages associated with the City's bad faith exclusion of EAS, including, but not limited to, the burdensome costs and expenses of servicing its Pawhuska clients from afar.

## COUNT IV
## Breach of Contract – First Agreement

91.    EAS repleads and incorporates in full paragraphs 1–90 above.

92.    EAS and the City entered in the First Agreement on April 26, 2019. Ex. 1

93.    EAS fulfilled its obligations under the First Agreement, including payment of required payments, fees and/or expenses, and maintained required insurance policies.

94.    The City breached material terms of the First Agreement, among other acts or omissions, by denying EAS access to the Pawhuska Airport water hydrants and Blue Office Building.

95.    Because of the City's breaches, EAS has suffered damages, including that it was forced to incur significant additional expenses to conduct it business operations, including bringing in truckloads of water to the Pawhuska Airport and the burdensome costs and expenses of servicing its Pawhuska clients from afar.

## COUNT V
## Breach of Contract – Second Agreement

96.    EAS repleads and incorporates in full paragraphs 1–95 above.

97.    EAS and the City entered in the Second Agreement on March 31, 2023. Ex. 5.

98.    EAS has fulfilled its obligations under the Second Agreement, including payment of required payments, fees and/or expenses, and maintained required insurance policies.

99.    The City has breached material terms of the Second Agreement by failing to perform its required obligations, including, but not limited to, failing to provide site boundaries to EAS where it may begin to construct a hangar.

100.   Because the City has breached and failed to perform its duties under the Second Agreement, EAS has suffered damages, including that it was forced to incur significant additional expenses to conduct it business operations, including the burdensome costs and expenses of servicing its Pawhuska clients from afar.

## COUNT VI
## Promissory Estoppel

101.   EAS repleads and incorporates in full paragraphs 1–100 above.

102.   Over the course of the last nearly seven years, the City has made promises to EAS that it would be permitted to operate its aerial spraying business from the Pawhuska Airport.

103.   Over the course of the last nearly seven years, the City has made promises to EAS that it would be permitted to construct a hangar at the Pawhuska Airport at its own expense and receive a lease to the same.

104.    For several spraying seasons, EAS has relied on those promises, continuing to advertise and contract with the farmers and ranchers of Pawhuska in anticipation that those contracts will be profitable for EAS. In other cases, EAS has been forced to withdraw from spraying contracts and business opportunities in the Pawhuska spraying market.

105.    EAS has fulfilled those contracts with many of Pawhuska's farmers and ranchers.

106.    EAS has suffered damages from its reliance on the City's promises, including that it was forced to incur significant additional expenses to conduct it business operations, including the burdensome costs and expenses of servicing its Pawhuska clients from afar.

107.    The City's failure to fulfill its years-long promises has been entirely unjust to EAS.

## IV.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants for each of the above claims and for an Order of the Court as follows:

a.    Directing Defendants to immediately perform all of their obligations under the Second Agreement, including providing EAS the site boundaries and taking any and all other steps as necessary under the Second Agreement for EAS to be able to promptly construct a hangar on the Pawhuska Airport property;

b.    Awarding Plaintiff damages sustained as a direct result of Defendants' breach and willful interference with Plaintiff's rights;

c.  Compensating Plaintiff for actual, incidental, and consequential damages for an amount to be determined at trial;

d.  Awarding Plaintiff treble damages under 79 Okla. Stat. § 205 and/or 15 U.S.C. § 15(a);

e.  Awarding Plaintiff punitive damages;

f.  Awarding Plaintiff all other damages that would place EAS in as good a position as it would have been had the Defendants not breached the First Agreement and the Second Agreement;

g.  Awarding Plaintiff its attorneys' fees and costs associated with this litigation; and

h.  Awarding Plaintiff any and all such further relief as this Court may deem just and equitable.

## **<u>Jury Trial Demand</u>**

Pursuant to Fed. R. Civ. P. 38, Plaintiff Emerich Aerial Spraying LLC demands trial by Jury for any and all applicable claims.

Respectfully submitted,

/s/ Jacob Oliphant
PHILLIP G. WHALEY, OBA #13371
COREY A. NELLER, OBA #19534
JACOB J. OLIPHANT, OBA #34748
**RYAN WHALEY**
400 North Walnut Avenue
Oklahoma City, Oklahoma 73104
(405) 239-6040
(405) 239-6766 FAX
pwhaley@ryanwhaley.com
cneller@ryanwhaley.com
joliphant@ryanwhaley.com
*Attorneys for Plaintiff*