## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

EMRICH AERIAL SPRAYING LLC,     )
    )
    Plaintiff,     )
    )
v.     )
    )
THE CITY OF PAWHUSKA, PAWHUSKA     )      Case No. 25-cv-00115-SH
MUNICIPAL AIRPORT AUTHORITY,     )
and PAWHUSKA MUNICIPAL AIRPORT     )
ADVISORY COMMITTEE,     )
    )
    Defendants.     )

## OPINION AND ORDER

Before the Court are Defendants' motions to dismiss Plaintiff's claims.[1]  The motions are granted in part and denied in part.

Plaintiff has failed to allege any facts regarding the Pawhuska Municipal Airport Advisory Committee, and all claims against that defendant are dismissed.  As for the remaining defendants, Plaintiff has failed to plead that they are competitors subject to an antitrust claim and has otherwise failed to plead a federal right protected under 42 U.S.C. § 1983.  The Court further finds that, as pled, the contract claims based on the Airport Hangar Lease are premature.  Plaintiff has sufficiently pled a claim under the original Aerial Applicator Agreement, but against the City of Pawhuska only.  Defendants have failed to show that Plaintiff's claims for promissory estoppel are barred by the statute of limitations.  Plaintiff may file a motion for leave to amend its complaint.  If no amendment is granted, the Court will consider whether to decline supplemental jurisdiction over the remaining state-law claims.

---

[1] The parties have consented to the jurisdiction of a U.S. Magistrate Judge for all purposes under 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(a).  (ECF No. 19.)

**Factual Background**

Taking the factual allegations in the complaint as true, and viewing them in the light most favorable to the nonmoving party, Plaintiff alleges as follows:

Emrich Aerial Spraying LLC ("Emrich") is a Nebraska company seeking to provide agricultural spraying services in the area surrounding the Pawhuska Airport in Osage County, Oklahoma (the "airport"). (*Id.* ¶¶ 1, 16–18.) Emrich contracts with farmers and ranchers to sell and apply fertilizers and pesticides during the agricultural spraying season.[2] (*Id.* ¶¶ 9, 17.)

In April 2019, Emrich began negotiating an agreement with the City of Pawhuska (the "City") and the Pawhuska Municipal Airport Authority (the "Airport Authority") to utilize the airport to expand Emrich's commercial operations in the area. (*Id.* ¶¶ 16, 18.) The airport is owned by the City and operated by the Airport Authority. (*Id.* ¶¶ 3, 5.) Members of City Council serve as members of the Airport Authority (*id.* ¶ 5), but the complaint does not allege that the Airport Authority's board consists solely of council members. The Pawhuska Municipal Airport Advisory Committee (the "Advisory Committee"), meanwhile, provides recommendations on management of the airport. (*Id.* ¶ 4.)

On April 26, 2019, Emrich and the City entered into an Aerial Applicator Agreement (the "agreement"), which provided that Emrich could use the airport in connection with its aerial application and crop-dusting business. (*Id.* ¶¶ 19–21; ECF No. 1-1 (copy of the agreement).[3]) Under the agreement, the City permitted Emrich to use

---

[2] In Osage County, the spraying season runs from around May 1 to July 4. (*Id.* ¶ 17.)

[3] As discussed *infra*, exhibits attached to a complaint are treated as a part of the pleading. *See Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

and access certain areas of the airport, as well as to use and pay for water associated with the City's water account until Emrich installed its own connection to the rural water supplier.  (ECF No. 1 ¶ 22; ECF No. 1-1 ¶¶ 1–2.)  The agreement was for the calendar year of 2019 and renewed automatically for two consecutive one-year terms unless a party gave written notice of its intent not to renew.  (ECF No. 1 ¶ 24; ECF No. 1-1 ¶ 1.)  Such notice was to be given 60 days prior to the April 26th contract anniversary date.  (ECF No. 1 ¶¶ 23–24; ECF No. 1-1 ¶ 1.)

Beginning in or about April 2019, the City continuously denied Emrich access to facilities at the airport.  (ECF No. 1 ¶ 26.)  Around that same time, the City informed Emrich that if it wished to operate at the airport, it would need to construct a building on the property at its own expense, which the parties agreed to discuss after the end of the 2019 spraying season.  (*Id.* ¶ 28.)

The next month, in May 2019, the City placed a new keypad on its airport office building and instructed Emrich to use the keypad for access.  (*Id.* ¶ 29.)  The City also told Emrich that it was no longer permitted to use the water hydrants associated with the City's water accounts at the airport.  (*Id.*)  The restriction on water was limited to Emrich and did not extend to Emrich's two competitors.  (*Id.* ¶¶ 30–31.)

A year later, in May 2020, the City had removed its locks from the water hydrants, and Emrich resumed using the City's water.  (*Id.* ¶ 35.)  That same month, Emrich received notice that the City had previously sent a letter attempting to terminate the agreement.  (*Id.* ¶ 37.)  The letter was dated February 18, 2020, but it was postmarked March 10, 2020.  (*Id.* ¶ 37; ECF No. 1-2 at 1, 3 (the termination letter).[4])

---

[4] References to page numbers refer to the ECF header.

On May 21, 2020, however, the City's attorney confirmed that Emrich would be allowed to use the airport, but gave notice that the agreement was not going to be renewed for a third year. (ECF No. 1 ¶¶ 40–41; ECF No. 1-3 at 1–2 (the attorney's letter).) The City also listed requirements for Emrich to adhere to while using the airport that season, else the agreement would be considered in default. (ECF No. 1-3 at 1–2.) These included no further use of the water hydrants or water systems at the airport by Emrich. (ECF No. 1 ¶ 40; ECF No. 1-3 at 1.)

In fall 2021, Emrich and the City began discussions about Emrich building a hangar at the airport, and the City promised to move forward with an agreement. (ECF No. 1 ¶ 45.) In November 2021, Emrich submitted a formal proposal, and the Airport Authority approved it on December 13, 2021. (*Id.* ¶¶ 46–47.) Airport Authority member Hank Benson told Emrich he would submit the recommendation to the City Council the next day, but he did not appear at that meeting in what Emrich believes was an attempt to avoid presenting the proposal.[5] (*Id.* ¶ 48.) Instead, Emrich presented the proposal; two other Airport Authority members reported the Authority's approval; and the City selected a designee to work with Emrich on the final terms of a lease agreement. (*Id.*) Subsequently, in February 2022, the City offered a site plan to Emrich that contained less acreage than had been allowed to Emrich's competitors and was not feasible for operations. (*Id.* ¶ 50; ECF No. 1-4 (the site plan).)

---

[5] The City argues there is insufficient factual basis for the conclusion that Benson acted with this intent (ECF No. 14 at 12), but Emrich has alleged sufficient additional facts—including the short time frame between Benson's representation that he would submit the proposal and his non-appearance, and the contradictory statements made by Benson as to whether the approval had occurred (ECF No. 1 ¶¶ 47–49).

Nevertheless, on March 31, 2023, the City and Emrich entered into an Airport Hangar Lease ("the lease"). (ECF No. 1 ¶ 51; ECF No. 1-5 (the lease).) Under the lease, Emrich agreed to build a hangar and chemical storage shed at the airport. (ECF No. 1 ¶ 51; ECF No. 1-5 ¶ 4.) Plans for the buildings were to be approved by the Airport Authority before commencement of construction. (ECF No. 1-5 ¶ 4.) Emrich agreed to begin construction within three years of execution of the lease—or by the end of March 2026—and to complete that construction within another year. (*Id.* ¶ 6.)

The lease did not define the premises to be leased. (*Id.* ¶ 1.) Instead, the lease provided that Emrich would submit a site plan to the City; then, the city manager would work with the airport engineer to develop and describe the boundaries for the site, along with provisions for proper access; and, lastly, the City would make a final determination from the recommendations given by the airport engineer. (*Id.* Ex. A.) In the two years between execution of the lease and the filing of this lawsuit, the City has not met its obligation to develop and describe the boundaries of the site to be leased. (ECF No. 1 ¶ 53.)

Instead, on April 11, 2024, Benson sent a letter to Emrich asserting that Emrich was in violation of the lease term requiring it to start construction of the buildings. (ECF No. 1 ¶ 55; ECF No. 1-6 (Benson letter); ECF No. 1-5 ¶ 6.) Benson also stated a preference for a different form of lease, which he offered for review. (ECF No. 1-6.) The City's attorney subsequently stated Emrich was <u>not</u> in breach of the lease. (ECF No. 1 ¶ 56.) On May 7, 2024, Benson again orally asserted Emrich was in breach of the lease. (*Id.* ¶ 57.) The City's attorney again confirmed in writing that Emrich was not considered in breach of the lease. (ECF No. 1 ¶ 58; ECF No. 1-7 (attorney confirmation e-mail).)

As of the filing of the lawsuit, Emrich was still waiting on the City to identify the site of the lease, so that it could construct the required buildings.  (ECF No. 1 ¶ 59.)

## Procedural Background

Emrich filed suit on March 10, 2025.  (ECF No. 1.)  Emrich asserts claims against all defendants for violations of section 2 of the Sherman Act, 15 U.S.C. § 2 (*id*. ¶¶ 76–80); the Oklahoma Antitrust Reform Act, Okla. Stat. tit. 79, § 203 (*id*. ¶¶ 81–83); and 42 U.S.C. § 1983 (*id*. ¶¶ 84–90).  Emrich also asserts state-law claims for breach of the original agreement (*id*. ¶¶ 91–95); breach of the lease (*id*. ¶¶ 96–100); and promissory estoppel (*id*. ¶¶ 101–107).

Defendants move to dismiss, arguing that (1) each cause of action is either time-barred or premature (ECF No. 14[6] at 3–6); (2) Emrich failed to allege an antitrust injury under the Sherman Act and the Oklahoma Antitrust Reform Act (*id*. at 6–8); (3) Emrich failed to exhaust its administrative remedies and cannot bring a private cause of action under 42 U.S.C. § 1983 (*id*. at 9–10); (4) the Airport Authority and Advisory Committee are not capable of being sued (ECF No. 15 at 3–4; ECF No. 16 at 3–4); and (5) the Airport Authority and Advisory Committee were not parties to the contracts or promises at issue (ECF No. 15 at 10–11; ECF No. 16 at 11–12).

## Analysis

### I.    Standard of Review

Defendants move to dismiss Emrich's action for failure to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  "[A] plaintiff must plead sufficient

---

[6] The motions to dismiss submitted by Defendants are substantially similar.  (*Compare* ECF No. 14 *with* ECF Nos. 15 & 16.)  As such, the Court will primarily reference the City's brief and cite the remaining motions only when they raise a separate argument.

factual allegations 'to state a claim to relief that is plausible on its face.'" *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104 (10th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  All such reasonable inferences are resolved in the plaintiff's favor. *Diversey v. Schmidly*, 738 F.3d 1196, 1199 (10th Cir. 2013).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555–56 (citation modified).

A statute of limitations argument, meanwhile, is an affirmative defense that must be raised by the defendant and often requires a resolution of factual disputes that cannot occur at the Rule 12 stage.  *Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022).  Instead, such a defense may be resolved on a Rule 12(b) motion only "when the dates given in the complaint make clear that the right sued upon has been extinguished." *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 671 (10th Cir. 2016) (internal quotations omitted).

In addition to the complaint itself, on a motion to dismiss "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."  *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).  Here, the Court considers the contracts, communications, and documents attached to Plaintiff's complaint.  (ECF Nos. 1-1–1-7.)  The Court also considers the Pawhuska Code of Ordinances.  *See Zimomra v. Alamo Rent-A-Car, Inc.*, 111 F.3d 1495, 1504 (10th Cir. 1997) (finding it appropriate for

the district court to take judicial notice of municipal ordinances when considering a motion to dismiss).

## II.   Capacity of the Airport Authority and the Advisory Committee to be Sued

As a preliminary matter, the Court considers whether the Airport Authority and the Advisory Committee may be sued under Oklahoma law.  Having raised the defense based on the face of the complaint, the Court finds that the Airport Authority has failed to demonstrate its availability.  The Court does not reach the issue as to the Advisory Committee, because the complaint fails to state any claims against it.

### A.   Capacity to Be Sued—Generally

Under the federal rules, a pleading generally need not allege a party's capacity to be sued.  Fed. R. Civ. P. 9(a)(1)(A).  A defendant, instead, raises the issue "by a specific denial, which must state any supporting facts that are peculiarly within the party's knowledge."  Fed. R. Civ. P. 9(a)(2).  While Rule 12(b) "does not specifically authorize a motion to dismiss based on a lack of capacity to be sued . . ., where the issue appears on the face of the complaint, [it] may be raised by a motion for failure to state a claim under Rule 12(b)(6)."  *Currin v. Okla. Cnty. Crim. Just. Auth.*, No. CIV-23-22-F, 2023 WL 3310173, at *1 (W.D. Okla. May 8, 2023) (citing 5A Wright & Miller's Federal Practice & Procedure § 1294 (4th ed.) (collecting cases)).

The Court looks to the law of the State of Oklahoma to determine the Airport Authority and Advisory Committee's capacity to be sued.[7]  *See* Fed. R. Civ. P. 17(b)(3).

---

[7] Neither entity is an individual or corporation, so its capacity to be sued is determined "by the law of the state where the court is located . . . ."  Fed. R. Civ. P. 17(b)(3).  Notably, even if capacity is lacking, an unincorporated association can be sued in its common name to enforce a substantive federal right.  Fed. R. Civ. P. 17(b)(3)(A).

## B.    The Airport Authority

The Airport Authority, citing a single Oklahoma statute stating that persons and certain entities <u>can</u> be sued, argues that because the Airport Authority is not one of those listed entities, it <u>cannot</u> be sued.  (ECF No. 15 at 3 (citing Okla. Stat. tit. 12, § 2017(B)).) The Airport Authority's conclusion is not supported by the limited citations it provides.

The Airport Authority is correct that, in Oklahoma, "any person, corporation, partnership, or unincorporated association[8] shall have capacity to sue or be sued . . . ." Okla. Stat. tit. 12, § 2017(B).  But this statute does not mean that other sorts of entities <u>lack</u> such a capacity.  *See, e.g.*, *Bond v. Okla. Cnty. Crim. Just. Auth.*, No. CIV-23-05-D, 2023 WL 2878772, at *2 (W.D. Okla. Apr. 10, 2023) (rejecting argument that section 2017 is "conclusive authority establishing that a public trust does not also have the capacity to be sued").

In fact, Oklahoma law contains many sources for the authority to sue or be sued beyond just section 2017, particularly for governmentally created entities.  *See, e.g.*, Okla. Stat. tit. 11, § 22-101(1) ("All incorporated municipalities . . . shall have the powers to . . . [s]ue and be sued"); Okla. Stat. tit. 11, § 24-107(U) (Oklahoma Municipal Power Authority may "sue or be sued"); Okla. Stat. tit. 11, § 38-107(A) (same, municipal Urban Renewal Authorities); Okla. Stat. tit. 19, § 1(1) (same, organized counties within the State); Okla. Stat. tit. 85A, § 100(B)(2) (same, Self-Insurance Guaranty Fund Board); Okla. Stat. tit. 36, § 2007(B)(3) (same, Oklahoma Property and Casualty Insurance Guaranty Association); Okla. Stat. tit. 36, § 2028(L)(2) (same, Oklahoma Life and Health Insurance

---

[8] Oklahoma law appears to recognize an unincorporated association when "any two or more persons associate themselves together and transact business for gain or speculation" under a particular name.  Okla. Stat. tit. 12, § 182.

Guaranty Association); Okla. Stat. tit. 36, § 6530.6(2) (same, Board of Directors established by the Oklahoma Insurance Commissioner under the Oklahoma Individual Health Insurance Market Stabilization Act); Okla. Stat. tit. 63, § 485.3(B) (same, Oklahoma Cerebral Palsy Commission).

Relevant here, in 1947, Oklahoma enacted the Municipal Airports Act, Okla. Stat. tit. 3, §§ 65.1–65.22.  The Act authorizes every municipality to establish, construct, maintain, and operate airports.  *Id.* § 65.2(A);[9] *see also Fine Airport Parking, Inc. v. City of Tulsa*, 2003 OK 27, ¶ 21, 71 P.3d 5, 12 (noting that powers exercised under the act are for a public purpose).  The Act provides that a municipality may grant the privileges of using the airport for commercial purposes or supplying goods or services at the airport. Okla. Stat. tit. 3, § 65.5(A)(1)–(2).  In each case, the municipality may "establish the terms and conditions and fix the charges, rentals or fees for the privileges," which themselves "shall be reasonable and uniform for the same class of privilege . . . and shall be established with due regard to the property and improvements used and the expenses of operation to the municipality."   Okla. Stat. tit. 3, § 65.5(A).  Oklahoma law allows a municipality to vest its authority under the Municipal Airports Act "in an officer or board or other municipal agency whose powers and duties shall be prescribed in the resolution . . . ."  Okla. Stat. tit. 3, § 65.7.  This includes a municipal airport authority.  *See City of Tulsa ex rel. Tulsa Airport Auth. v. Air Tulsa, Inc.*, 1992 OK 146, ¶ 18, 851 P.2d 519, 522 (finding City of Tulsa properly delegated its authority to the Tulsa Airport Authority).

---

[9] In 2024, two different versions of various amendments to the Municipal Airports Act were signed into law.  *See* 2024 Okla. Sess. Law Serv. Ch. 18 (H.B. 3672) (approved April 18, 2024); 2024 Okla. Sess. Law Serv. Ch. 135 (S.B. 1912) (approved Apr. 23, 2024).  As each enactment amends and restates the affected sections in their entirety, the Court cites the later-approved version—S.B. 1912.

In accordance with the Municipal Airports Act, the Pawhuska Code of Ordinances has created the Airport Authority and given it certain powers. *See* Pawhuska Code of Ordinances tit. IX, §§ 98.01, 98.06(A).[10] These powers include full and complete authority to manage, operate, improve, extend, and maintain the Pawhuska Municipal Airport—including entering into agreements, leases, and contracts with private individuals for the privilege of using or improving the airport. *Id.* § 98.06(A) & (A)(4). The Airport Authority also has "the other and further powers as are now given to any charter municipality under the laws of the State" of Oklahoma except where those may conflict with the City's charter or other ordinances. *Id.* § 98.06(A)(7). Such municipalities, including the City of Pawhuska, have the power to sue or be sued. *See* Okla. Stat. tit. 11, § 22-101(1) ("All incorporated municipalities . . . shall have the powers to . . . [s]ue and be sued . . . .");[11] *see also* Pawhuska Charter, § 3 ("The City shall have power . . . to sue and to be sued . . . .").[12] And the Airport Authority has provided no authority for the proposition that it would otherwise conflict with the City's charter or other ordinances for the Authority to sue or be sued.

As such, at this motion to dismiss stage, the Airport Authority has failed to meet its burden of showing it lacks capacity.

---

[10] Title IX of the City's Code of Ordinances is available at https://www.pawhuska.org/sites/g/files/vyhlif8551/f/uploads/paw_09.pdf [https://perma.cc/B5K2-SJTG].

[11] The Oklahoma Municipal Code defines a "charter municipality" as "any municipality which has adopted a charter . . . ." Okla. Stat. tit. 11, § 1-102(1). Meanwhile, the term "municipality" means "any incorporated city or town." *Id.* § 1-102(5).

[12] The Pawhuska Charter is available at https://www.pawhuska.org/sites/g/files/vyhlif8551/f/uploads/00paw_charter.pdf [https://perma.cc/5MMM-CKKN].

### C.    The Advisory Committee

The Court need not decide whether the Advisory Committee may sue or be sued, because the complaint contains no factual allegations regarding the Advisory Committee.[13]  The entirety of the allegations regarding the Advisory Committee are as follows:  "The Pawhuska Municipal Airport Advisory Committee is a citizen of Oklahoma providing recommendations on the management of the Pawhuska Airport."  (ECF No. 1 ¶ 4.)  This falls far short of stating a plausible claim for relief under any law.[14]  Plaintiff's claims against the Advisory Committee will, therefore, be dismissed without prejudice for failure to state a claim upon which relief may be granted.

## III.    Antitrust Claims

The Court next considers whether Emrich has sufficiently pled antirust claims against the City and the Airport Authority under federal and state law.  Federally, Defendants assert that Emrich's claims are untimely and that it has failed to allege an antitrust injury or to plead a claim under section 2 of the Sherman Act.[15]  (ECF No. 14 at

---

[13] The Advisory Committee is another creature of the City's ordinances.  *See* Pawhuska Code of Ordinances, § 98.35.  It is formed of local citizens to provide recommendations to the City regarding the resolution of certain issues related to the airport.  *Id.* § 98.35(A)–(B).

[14] The first page of the complaint alternatively uses the term "City" to refer to the City of Pawhuska and, also, to all defendants collectively.  (*See* ECF No. 1 at 1 & ¶ 2.)  Reviewing the remainder of the complaint, however, it appears that the "City" refers only to the City of Pawhuska—e.g., "Pawhuska Airport is owned by the City" (*id.* ¶ 5); "EAS and the City entered into an *Aerial Applicator Agreement*" (*id.* ¶ 19); "the City informed EAS at a City Council meeting . . ." (*id.* ¶ 28).  The undersigned interprets the complaint as referring to the City of Pawhuska, specifically, in allegations referencing the "City."

[15] Defendants do not raise, and the Court does the address, the City and Airport Authority's potential exemption from liability under the doctrine established in *Parker v. Brown*, 317 U.S. 341 (1943), or from damages under the Local Government Antitrust Act of 1984, 15 U.S.C. § 34–36.  "[T]he *Parker* doctrine exempts . . . anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, *(cont. on next page)*

4–7.) Defendants make similar arguments under state law.[16] (*Id.* at 5, 8.) The Court finds that Emrich has failed to state a claim and does not address Defendants' other arguments.

### A.     Section 2 of the Sherman Act

#### 1.     Generally

Emrich brings its antitrust claims under section 2 of the Sherman Act, 15 U.S.C. § 2, which makes it unlawful for a person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2. Section 4 of the Clayton Act, 15 U.S.C. § 15, "creates a private cause of action for any person who has been 'injured in his business or property by reason of anything forbidden in the antitrust laws,' and provides for treble damages." *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 750 (10th Cir. 1999) (quoting 15 U.S.C. § 15(a)).

Section 2 of the Sherman Act applies to three distinct kinds of claims— monopolization, attempted monopolization, and combinations or conspiracies to

---

pursuant to state policy to displace competition with regulation or monopoly public service." *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 413 (1978). "Municipalities, on the other hand, are not beyond the reach of the antitrust laws by virtue of their status because they are not themselves sovereign." *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 38 (1985). "Rather, to obtain exemption, municipalities must demonstrate that their anticompetitive activities were authorized by the State 'pursuant to state policy . . . .'" *Id.* at 38–39 (quoting *Lafayette*, 435 U.S. at 413).

[16] Defendants do not raise, and the Court does not address, whether the City and Airport Authority may be sued under the Oklahoma Antitrust Reform Act for the anti-competitive effects of actions taken by a municipal airport. *See Fine Airport Parking*, 2003 OK 27, ¶ 29, 71 P.3d 5, 14 (holding municipality may fix the rate for an airport parking service even though it may have anti-competitive effects).

monopolize.  Emrich does not assert a combination or conspiracy claim.[17]  To state a monopolization claim for damages, the plaintiff must plead (1) the defendant's possession of monopoly power in the relevant market;[18] (2) the defendant's willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident; and (3) that plaintiff's injuries were caused by the defendant's anticompetitive conduct.  *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1168 (10th Cir. 2023); *see also id.* at 1168–69 (noting these are often shortened to (1) monopoly power, (2) exclusionary conduct, and (3) antitrust injury).  To state an attempted monopolization claim, the plaintiff must plead "(1) relevant market (including geographic market and relevant product market); (2) dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such an attempt."  *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) (internal quotations omitted).  Again, to recover damages, "a private plaintiff . . . 'must

---

[17] The complaint mentions that Emrich originally negotiated with Kevin Brown about partnering with his company, Bluestem Aerial, to expand into Oklahoma, but Brown later sold Bluestem and kept a percentage of profits for himself.  (ECF No. 1 ¶¶ 11, 14–15.)  The complaint further alleges that Defendants provided favorable treatment to Bluestem and Deterding Aerial, who are Emrich's competitors.  (*Id.* ¶¶ 31, 42, 67.)  But Emrich does not allege that Defendants conspired or combined with these companies.

[18] For each cause of action under section 2 of the Sherman Act, "plaintiffs must define the relevant market . . . ."  *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1239 (10th Cir. 2016).  "The relevant product market in any given case 'is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.'"  *Id.* at 1244–45 (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 966 (10th Cir. 1994)).  The "geographic market is the narrowest market which is wide enough so that products from adjacent areas cannot compete on substantial parity with those included in the market.'"  *Id.* at 1245 (quoting *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1222 (10th Cir. 1986)).  "Together these factors define a real economic market for purposes of antitrust analysis."  *Id.*

prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Full Draw*, 182 F.3d at 750 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick*, 429 U.S. at 489.

### 2.    Emrich Has Failed to Plead a Claim under Section 2 of the Sherman Act

As noted above, Emrich's section 2 claims require that a defendant either possesses monopoly power in the relevant market or has a dangerous probability of success in monopolizing the relevant market.  It its complaint, Emrich claims that "the relevant product market[]" is "aeronautical spraying services in the relevant geographic market." (ECF No. 1 ¶ 77.)  Likewise, the alleged relevant geographic market appears to be the area accessible for spraying services via the Pawhuska Municipal Airport.  (*See id.* ¶¶ 16, 64, 71.)

In a usual monopoly, "suppliers utilize market power to restrict output and thereby raise prices." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008).   Monopoly  power  under  section  2  "is  conventionally  understood  to  mean 'substantial' market power." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) ¶ 801; *id.* ¶ 801a (noting most recent cases dismiss claims where the defendant's market share is less than 50%). Here, however, there is no allegation that the City or the Airport Authority has <u>any</u> market share in the relevant market of aeronautical spraying services, or that either governmental entity was attempting to obtain any.

Stated more simply, if an entity acts alone and is "not a competitor" in the relevant market, they cannot be a defendant in a section 2 monopoly claim.[19]  *See, e.g.*, *Mercy-Peninsula Ambulance, Inc. v. San Mateo Cnty.*, 791 F.2d 755, 759 (9th Cir. 1986) ("the county is not a competitor in the health care provision market and cannot be charged with having used market position to exclude competition"); *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 (9th Cir. 2015) ("Because ICANN is not a competitor in any of the three [relevant] markets, they cannot serve as the basis for a § 2 monopoly claim."); *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 334–35 (5th Cir. 2015) (finding defendant AQHA entitled to judgment where nothing "shows that AQHA competes in the elite Quarter Horse Market"); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1075 (11th Cir. 2004) ("There is no question that CC does not participate in the Spanish-language radio market.  Thus, CC cannot attempt to monopolize that market."); *Beard v. Parkview Hosp.*, 912 F.2d 138, 144 (6th Cir. 1990) (finding judgment appropriate for defendant who "does not compete . . . as a provider of osteopathic radiological services in" the geographic market).

---

[19] There is no allegation that the City/Airport Authority acted in concert with others who <u>are</u> competitors in an attempt to monopolize—or in monopolizing—the relevant market. For example, in *Full Draw*, the defendants included the plaintiff's sole competitor, AMMO, and other defendants who "controlled or influenced AMMO." *Full Draw*, 182 F.3d at 751.  The Tenth Circuit found the complaint adequately alleged attempted monopolization where the defendants' boycott "eliminated the only competitor to defendant AMMO's trade show," which was done with the intent "to monopolize the relevant market [of archery trade shows in the United States], in order to destroy the [plaintiff's competing trade show] and create a monopoly for AMMO." *Id.* at 756.  The plaintiff also stated a monopolization claim where "defendants obtained monopoly power," as "AMMO is now the sole producer of archery trade shows, [meaning] AMMO and its members have the power to control prices in the market." *Id.* at 756–57.

Because neither defendant here is alleged to have been competing with Emrich for market power in the relevant market, the Court finds Emrich has failed to state a claim under section 2 of the Sherman Act and does not reach Defendants' other arguments.[20]

**B.     Oklahoma Antitrust Reform Act**

**1.     Generally**

Like section 2 of the Sherman Act, the Oklahoma Antitrust Reform Act makes it "unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce in a relevant market within this state." Okla. Stat. tit. 79, § 203(B).  Provisions of the Oklahoma Antitrust Reform Act are interpreted in a manner consistent with federal antitrust law.  *See* Okla. Stat. tit. 79, § 212; *see also Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1281 (10th Cir. 2004) (applying law under section 2 of the Sherman Act to a claim under section 203(B)); *Bristow Endeavor Healthcare, LLC v. Blue Cross & Blue Shield Ass'n*, 691 F. App'x 515, 520 (10th Cir. 2017) (applying federal "attempted monopolization" factors to section 203(B) claim).[21]

---

[20] Emrich also pleads that the City acted with the intent to use its control of an essential facility (the airport) to limit competition within the relevant market of agricultural spraying services.  (ECF No. 1 ¶ 78.)  The Tenth Circuit has recognized the "essential facilities" doctrine as a way of showing monopolization.  *See Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1520–21 (10th Cir. 1984), *aff'd on other grounds*, 472 U.S. 585 (1985).  The elements to establish liability under this doctrine are "(1) control of the essential facility by a monopolist; (2) a competitor's inability to duplicate the facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility."  *Id.* at 1520.  Again, Emrich has not pled these elements, as it has not alleged it is a competitor of the City or Airport Authority in the provision of agricultural spraying services.

[21] Unpublished decisions are not precedential, but they may be cited for their persuasive value.  10th Cir. R. 32.1(A).

### 2.    Emrich Has Failed to Plead a Claim under the Oklahoma Antitrust Reform Act

Emrich's claims under section 203(B) of the Oklahoma Antitrust Reform Act fail for the same reasons as those under section 2 of the Sherman Act. As such, the Court does not reach Defendants' other arguments.

## IV.    Section 1983 Claims

In its complaint, Emrich also asserts claims under 42 U.S.C. § 1983, contending Defendants violated its "guaranteed rights" under 49 U.S.C. § 47107.[22] (ECF No. 1 ¶¶ 84–90.) Defendants argue that any § 1983 action is time-barred and that Emrich has failed to state a cognizable claim under the statute. (ECF No. 14 at 4, 9–10.)

Having considered the parties' arguments, the Court finds that section 47107 does not create statutory rights protected by § 1983. The Court further finds that Emrich has not pled a § 1983 claim based on the Fourteenth Amendment. The Court does not reach Defendants' other arguments.

### A.    42 U.S.C. § 1983—Generally

Section 1983 assigns liability to every person who, under color of State law, deprives someone of "any rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. "Historically, individuals brought § 1983 suits to vindicate rights protected by the Constitution," but the Supreme Court "recognized that § 1983 also authorizes private parties to pursue violations of their federal statutory

---

[22] Emrich also alleges Defendants failed to comply with the Oklahoma Open Meetings Act, presumably as support for its allegations that they violated its rights under § 47107. (ECF No. 1 ¶ 86.) To the extent this allegation is intended as an independent basis for the § 1983 claim, it would fail. *See Gaines v. Stenseng*, 292 F.3d 1222, 1225 (10th Cir. 2002) (noting there is "no cognizable claim under § 1983" for the alleged violation of state statutes).

rights." *Medina v. Planned Parenthood S. Atl.*, 606 U.S. ---, 145 S. Ct. 2219, 2229 (2025). Statutes, however, "create individual rights only in atypical cases." *Id.* (citation modified). For a statute to create an enforceable right, privilege, or immunity, it must clearly and unambiguously use "rights-creating terms" and "display an unmistakable focus on individuals like the plaintiff." *Id.* (citation modified). Even for the "rare statute" that satisfies this stringent and demanding test, "a § 1983 action still may not be available if Congress has displaced § 1983's general cause of action with a more specific remedy." *Id.*

Spending-power statutes are "especially unlikely" to satisfy this test. *Id.* at 2230; *see also id.* at 2231 (noting, in the context of federal grants, Congress alone has historically had the power to enforce grant conditions). Recipients of federal grants must "voluntarily and knowingly" consent to answer private § 1983 enforcement suits before such suits may proceed, and this "consent cannot be fairly inferred if the federal spending-power statute fails to provide 'clear and unambiguous' notice that it creates a personally enforceable right." *Id.* at 2234.

### B.    49 U.S.C. § 47107 and FAA "Grant Assurances"

Here, Emrich asserts that it is "guaranteed the right to equal and fair opportunity to use the Pawhuska Airport and its resources" pursuant to 49 U.S.C. § 47107 and certain provisions in the "Grant Assurances." (ECF No. 1 ¶ 85.)

#### 1.    49 U.S.C. § 47107—Generally

"The federal government, through the Federal Aviation Administration ('FAA'), has been given authority by Congress to provide airport improvement grants to state and local governments." *Mineta v. Bd. of Cnty. Comm'rs*, No. 05-CV-0297-CVE-PJC, 2006 WL 2711559, at *1 (N.D. Okla. Sept. 19, 2006). Such grants "fall within congressional authority to spend for the general welfare." *Id.* at *6.

"Congress has required that [these] grant applications contain certain written assurances that an airport sponsor . . . will abide by a variety of requirements." *41 N. 73 W., Inc. v. U.S. D.O.T.*, 408 F. App'x 393, 395 (2d Cir. 2010) (citing 49 U.S.C. § 47107(a)). The "Secretary of Transportation is responsible for ensuring compliance with these assurances . . ., and is authorized to approve grant applications only if the airport sponsor's assurances are 'satisfactory to the Secretary.'" *Id.* (citing 49 U.S.C. § 47107(g) and quoting 49 U.S.C. § 47107(a)).  To facilitate compliance, the Secretary of Transportation has promulgated the set of standardized "grant assurances" that Emrich references in its complaint.  *See* FAA, Airport Sponsor Assurances (Apr. 2025).[23]  Emrich asserts Defendants violated assurances regarding economic nondiscrimination (§ 22), no exclusive right of use (§ 23), and hangar construction (§ 38).  (ECF No. 1 ¶ 85.)

Any individual that is "directly and substantially affected" by an "airport sponsor's alleged noncompliance with a Grant Assurance [may] file a formal complaint with the FAA." *41 N. 73 W., Inc.*, 408 F. App'x at 396 (quoting 14 C.F.R. § 16.23(a)).  "If the [FAA] pleadings reveal a 'reasonable basis for further investigation,' the FAA investigates" and "issues an 'initial determination.'"  *Id.* (quoting 14 C.F.R. §§ 16.29 & 16.31).  If the complaining party's case is dismissed by the FAA, the party can "file an administrative appeal to the Associate Administrator for Airports," who then issues a final decision that is "reviewable by a federal appellate court via petition."  *Id.* (citing 14 C.F.R. §§ 16.31, 16.33, 16.247, and 49 U.S.C. § 46110).

---

[23] This document is available at https://www.faa.gov/airports/aip/grant_assurances/assurances-airport-sponsors-2025 [https://perma.cc/ME4E-XTAR].

### 2.    No Enforceable Right, Privilege, or Immunity under § 47107

The question before the Court, then, is whether these "grant assurances" given by state and local governments receiving federal funding for airport improvements explicitly contemplate private causes of action under § 1983, in addition to an administrative enforcement scheme. The Court finds they do not.

Overwhelmingly, courts have found that § 47107 creates no right of action under § 1983 for parties harmed by an alleged violation of the "grant assurances" given to the Secretary of Transportation. *See, e.g.*, *Carey v. Afton-Lincoln Cnty. Mun. Airport Joint Powers Bd.*, No. 07-CV-286-D, 2008 WL 11411455, at *3–5 (D. Wyo. June 4, 2008) (finding no § 1983 claim for violation of § 47107 and noting this is consistent with the "overwhelming majority of cases interpreting the [Airport and Airway Improvement Act]" (collecting cases)); *Four T's, Inc. v. Little Rock Mun. Airport Comm'n*, 108 F.3d 909, 916 (8th Cir. 1997) (finding § 47107 indicates Congress's intent to establish an administrative enforcement scheme "rather than a private right of action" or an action under § 1983); *Ricks v. City of Winona*, 858 F. Supp. 2d 682, 687–88 (N.D. Miss. 2012) (finding no right of action under § 1983 (collecting cases)); *see also Mid-Atl. Soaring Ass'n, Inc. v. F.A.A.*, No. RDB 05-2110, 2006 WL 1892412, at *6 & n.5 (D. Md. June 29, 2006) (finding that while a § 1983 claim was not available, this did not preclude plaintiff "from filing a complaint with the FAA"). The one case Emrich cites that found an enforceable right under § 1983 relies on cases that are no longer good law after *Medina*. *See Cedarhurst Air Charter, Inc. v. Waukesha Cnty.*, 110 F. Supp. 2d 891, 898–99 (E.D. Wis. 2000)

(relying on *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 503 & 509 (1990)[24] and *Mallett v. Wis. Div. of Vocational Rehab.*, 130 F.3d 1245, 1253 (7th Cir. 1997) (which itself relies on *Wilder*) as examples of cases permitting such § 1983 actions).  Therefore, the Court finds that Emrich has failed to state a claim for violation of 42 U.S.C. § 1983 based on the defendants' alleged violations of 49 U.S.C. § 47107.

### C.  Equal Protection under the Fourteenth Amendment

In its response brief, Emrich separately—and very briefly—argues that it has pled that Defendants violated the Equal Protection Clause of the Fourteenth Amendment. (ECF No. 21 at 10–11.)  To the extent Emrich intended to assert an equal protection claim in its complaint, the undersigned cannot discern it.  *See Watson v. Williams*, 329 F. App'x 193, 196 & n.5 (10th Cir. 2009) (upholding dismissal of equal protection claim where plaintiff, *inter alia*, "failed to allege any unequal treatment due to his membership in a protected class or group" and where the court would not "read a class-of-one claim into the bare allegations" of the complaint).  The Court will grant Defendants' motion to dismiss Emrich's § 1983 claims.

### V.  Contract Claims

Regarding Emrich's contract claims, the City argues that Emrich's claim for breach of the original agreement is barred by the statute of limitations, while its claim based on the lease is premature.[25]  (ECF No. 14 at 5–6.)  The Airport Authority adds that it is not a party to either contract.  (ECF No. 15 at 10–11.)

---

[24] "Some lower court judges, including in this case, still consult *Wilder* . . . when asking whether a spending-power statute creates an enforceable individual right.  They should not."  *Medina*, 145 S. Ct. at 2234 (citation omitted).

[25] Defendants ask that—if the Court dismisses the federal claims—it decline to exercise supplemental jurisdiction over the remaining state-law claims.  (*E.g.,* ECF No. 14 at 5 n.5.) *(cont. on next page)*

### A.  Emrich Has Failed to State a Breach of Contract Claim against the Airport Authority

In its complaint, Emrich has failed to allege that the Airport Authority is a party to either the original agreement or the lease.  Its contract claims against the Airport Authority will be dismissed.

To recover for breach of contract, Plaintiff must show (1) formation of a contract; (2) breach of that contract; and (3) damages as a direct result of that breach.[26]  *Digital Design Grp., Inc. v. Info. Builders, Inc.*, 2001 OK 21, ¶ 33, 24 P.3d 834, 843.  Formation of a contract requires (1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) sufficient cause or consideration.  Okla. Stat. tit. 15, § 2.  Generally, "contracts are binding only upon those who are parties thereto."  *Drummond v. Johnson*, 1982 OK 37, ¶ 25, 643 P.2d 634, 639.  There are no allegations that the Airport Authority is a party to either the original agreement or the lease, much less that it breached either. (*See, e.g.*, ECF No. 1 ¶ 92 ("EAS and the City entered in the First Agreement"); *id.* ¶ 94 (the "City breached material terms of the First Agreement"); *id.* ¶ 97 ("EAS and the City entered in the Second Agreement"); *id.* ¶ 99 (the "City has breached material terms of the Second Agreement"); ECF No. 1-1 (showing only Emrich and the City as parties to the original agreement); ECF No. 1-5 (showing only Emrich and the City as parties to the lease).)  Thus, Emrich has failed to state a claim against the Airport Authority for breach of contract.

---

As noted below, while the Court has dismissed the federal claims, it is allowing Emrich to file a motion to amend.  The Court, therefore, addresses Defendants' arguments regarding the remaining state-law claims.

[26] The parties assume that Oklahoma law governs the substance of, and limitations to, Emrich's state-law claims, and the Court does the same.

In its response brief, Emrich argues that the Airport Authority "is an alter-ego of the City." (ECF No. 22 at 12–13.) Emrich appears to be referring to a theory for piercing the corporate veil, under which courts may "disregard the corporation as a separate entity," namely "where a business association becomes the 'alter ego' of one or more stakeholders, such that a court will consider the stakeholder(s) and business association to be synonymous." *Mattingly L. Firm, P.C. v. Henson*, 2020 OK CIV APP 19, ¶ 17, 466 P.3d 590, 595 (listing factors considered). Emrich pleads no facts indicating that the City and the Airport Authority are mere alter egos of each other, such that they should be treated as a single entity. Additionally, there is no law provided in Emrich's brief indicating that the alter-ego theory applies to municipalities and their subordinate entities.[27]

### B.     Emrich Has Stated a Breach of Contract Claim against the City under the Original Contract, But Does Not (Currently) State a Claim under the Lease

#### 1.     The Original Contract

The City has failed to clearly show, based on the allegations in the complaint, that Emrich's right to sue under the original contract has been extinguished. *See Sierra Club*, 816 F.3d at 671. Under Oklahoma law, an action on a written contract must be brought within five years. Okla. Stat. tit. 12, § 95(A)(1). The action accrues when the contract is breached (and not when damages result). *Morgan v. State Farm Mut. Auto. Ins. Co.*, 2021 OK 27, ¶ 25, 488 P.3d 743, 750. "When performance of a duty under a contract is

---

[27] The one case cited by Emrich is not on point. (*See* ECF No. 22 at 12–13 (citing *Advanced Techs. v. Inverness Vill., Inc.*, No. 05-CV-254-TCK-SAJ, 2006 WL 8458164, at *2 (N.D. Okla. Feb. 23, 2006)).) *Advanced Technologies* involved corporate entities, and the court there found sufficient allegations—either alleged in the complaint or in a subsequent amended complaint allowed "so long as the defect could be remedied"—that the two companies functioned as a single entity. 2006 8458164, at *2.

due[,] any non-performance is a breach."   Restatement (Second) of Contracts § 235 (1981).

   Citing no authority, the City argues its alleged breach of the original agreement in April 2019 insulates it from suit for any subsequent breaches, unless Emrich brought suit within five years of the first breach.  (ECF No. 14 at 5.)  The City's argument is divorced from the facts alleged in the complaint and unsupported by basic principles of contract law.

   As noted above, Emrich alleges it entered into the first, year-long agreement in April of 2019, but the City almost immediately began denying Emrich access to facilities at the airport in breach of the terms of the agreement.  Then, in May 2019, the City also stopped letting Emrich use the water hydrants at the airport.  According to Emrich, the agreement automatically renewed for another one-year term in April of 2020, and, in May 2020, the City restored access to the water hydrants.  Later that month, on May 21, 2020, the City again threatened Emrich with a loss of access to the water, stating that if Emrich exercised this alleged contractual right, the City would consider it in default of the agreement.  The May 2020 letter also imposed additional requirements on Emrich, which Emrich asserts were a breach of the parties' agreement.  Emrich brought this suit on March 10, 2025, more than five years after the alleged breaches during 2019 (the first term of the agreement), but less than five years after the alleged breaches during 2020 (the second term of the agreement).

   The Tenth Circuit has determined that Oklahoma would find—in the case of a continuing contract—that the plaintiff can sue for any failure to comply with the contract that occurs within the five years preceding the lawsuit.  *See Paul Holt Drilling, Inc. v.*

*Liberty Mut. Ins. Co.*, 664 F.2d 252, 255–56 (10th Cir. 1981) (citing, among other things, 4A Corbin on Contracts § 956 (1951)[28]).  As Corbin states,[29]

> There are contracts . . . that have been said to require continuing (or continuous) performance for some specified period of time, a period that may be definite or indefinite when the contract is made.  These contracts, too, are capable of a series of "partial" breaches, as well as of a single total breach by repudiation or by such a material failure of performance . . . as to go "to the essence" and to frustrate substantially the purpose for which the contract was agreed to by the injured party.  For each "partial" breach a separate action is maintainable, just as in the case of an "installment" contract; and for a series of "partial" breaches occurring before any action is brought only one action is maintainable.

10 Corbin on Contracts § 53.14 (2025); *see also W. Nat. Gas Co. v. Cities Serv. Gas Co.*, 1972 OK 76, ¶ 19, 507 P.2d 1236, 1242 (action not barred by statute of limitations where defendant had a continuing obligation to disclose information).

As pled in the complaint, the City's obligations under the original agreement were of a continuing nature.  Emrich was to, *inter alia*, have the continuous non-exclusive right to use the blue office building and to pay for water usage associated with the City's water accounts until it had its own connection to the rural water supplier.  The complaint also appears to allege that the City allowed the contract to renew for a second one-year term (i.e., it failed to terminate the agreement in a timely manner) and that it removed the blockade of the water hydrants by May 2020, before again attempting to withdraw access later that month.  Drawing all inferences in Emrich's favor, there was a contract with the

---

[28] Now 10 Corbin on Contracts § 53.14 (2025).

[29] The Oklahoma Supreme Court has frequently cited to Corbin on Contracts.  *See, e.g.*, *Max True Plastering Co. v. U.S. Fid. & Guar. Co.*, 1996 OK 28, n.34, 912 P.2d 861, 868 n.34 (citing 1 Corbin on Contracts § 1 (1963)); *Thompson v. Est. of Coffield*, 1995 OK 16, 894 P.2d 1065, 1067–68 (citing Corbin on Contracts §§ 580, 614 (1960)); *Crockett v. McKenzie*, 1994 OK 3, n.8, 867 P.2d 463, 467 n.8 (citing 3A Corbin on Contracts § 546 (1960)); *Bonner v. Okla. Rock Corp.*, 1993 OK 131, n.44, 863 P.2d 1176, 1184 n.44 (citing 3 Corbin on Contracts § 562 (1960)).

26

City that required continued performance; the City did not fully repudiate the contract, or otherwise commit a total breach of the contract, before March of 2020; [30] and the City committed a subsequent breach of the contract after March of 2020.

Moreover, as the quotation from Corbin above indicates, it is not necessary to specially classify the parties' contract as one requiring continuing performance for Emrich's claims to survive. As Corbin notes,

> While in the case of a total breach the injured party can at once get judgment for his entire injury, it is not always necessary for him to elect this remedy. In some cases he may elect to regard the breach as partial, proceed with his own performance, sue for the partial injury, and maintain a second suit in case a further breach occurs. He generally has no such election, however, in case the wrongdoer has repudiated the contract, expressing his intention to perform no further.

10 Corbin on Contracts § 53.4 (2025) (footnote omitted).[31]

The City has failed to show that the dates given in the complaint make it clear that Emrich's right to sue has been extinguished. Therefore, the City's motion will be denied as to the original agreement.

### 2.    The Lease

Emrich's arguments regarding the lease, however, are less successful. As noted above, the lease gives Emrich the right to lease a portion of the airport. Emrich has agreed to begin construction of a hangar and storage shed on that parcel by March 31, 2026. The

---

[30] "A claim for damages for total breach is one . . . based on all of the injured party's remaining rights to performance." Restatement (Second) of Contracts § 236(1). "A claim for damages for partial breach is one . . . based on only part of the injured party's remaining rights to performance." *Id.* § 236(2).

[31] "It is perfectly clear, also, that where a non-performance is so material that the injured party may treat it as a 'total' breach if he wishes but is not accompanied by a repudiation of the contract, he may sue as for a 'partial' breach only and the statute will not begin to run against an action for a subsequent failure of performance until it in fact occurs." 10 Corbin on Contracts § 53.9 (2025).

27

lease also provides that the City will determine the portion to be leased (and on which this construction may occur). The City has not yet fulfilled its obligation in this regard.

The lease does not provide a timeline for when the City must determine the relevant site under the lease, although there is a reasonable inference that the City would need to act in time for Emrich to be able to begin construction by March of 2026. Emrich, however, has not alleged that the City's failure to act has been so delayed as to constitute a breach of the lease.[32]

In its response brief, Emrich argues that the City has, nevertheless, breached its implied duty of good faith and fair dealing by twice telling Emrich it is in breach of the lease and then attempting to alter the terms of the lease. (ECF No. 21 at 6–7.) Emrich appears to base this argument on two statements by Hank Benson, who is identified in the complaint only as a member of the Airport Authority and not an agent of the City. (*See* ECF No. 1 ¶¶ 47, 55, 57; *see also* ECF No. 1-6.) The complaint further notes that the City's attorney has explicitly contradicted Benson both times. (ECF No. 1 ¶¶ 56, 58; ECF No. 1-7.) Even if Benson's actions could constitute a breach of the covenant of good faith and fair dealing, Emrich has failed to allege those actions are attributable to the City.

Consequently, Emrich has failed to plead facts from which the Court could find a plausible claim for a current breach of the lease by the City.

## VI.   Promissory Estoppel

Finally, the City argues Emrich's claims for promissory estoppel are untimely whether the Court applies the three-year statute of limitations for implied oral contracts or the five-year statute of limitations for written promises. (ECF No. 14 at 5–6 & n.6

---

[32] Emrich makes an argument that such a delay has occurred in its briefing (ECF No. 21 at 7), but there are no factual allegations to this effect in the complaint.

(citing Okla. Stat. tit. 12, § 95(A)(1)–(2).)  Likewise, the Airport Authority argues Emrich may not assert a promissory estoppel claim against it because it "was not a party to any promise or agreement."  (ECF No. 15 at 11.)  The Court rejects both arguments.

Under Oklahoma law, promissory estoppel requires "(1) a clear and unambiguous promise, (2) foreseeability by the promisor that the promisee would rely upon it, (3) reasonable reliance upon the promise to the promisee's detriment and (4) hardship or unfairness can be avoided only by the promise's enforcement."  *Russell v. Bd. of Cnty. Comm'rs*, 1997 OK 80, ¶ 27, 952 P.2d 492, 503.  Even within three years prior to Emrich's March 2025 filing date, Emrich alleges promises and foreseeable reliance sufficient to carry their promissory estoppel claim against the City past the pleading stage.  (*See* ECF No. 1 ¶¶ 51–75, 101–107.)  Similarly, Emrich alleges the Airport Authority made promises that at least arise within the five-year statute of limitations.  (*Id.* ¶¶ 45–49.)

Again, where the defendants bear the burden of proving their affirmative defense, the Court will not dismiss a complaint unless it is clear from the allegations in the complaint that the defense applies.  There is no such clarity here.  Defendants' arguments regarding Emrich's promissory estoppel claims are rejected.

## VII.   Leave to Amend

In its response brief, Emrich asks for leave to amend should the Court be inclined to grant any portion of Defendants' motions to dismiss.  (*E.g.,* ECF No. 21 at 2.)  The local rules require a motion to amend to include a statement as to whether another party objects and a summary of the proposed changes.  LCvR 7-1(h).  (The undersigned prefers a copy of the proposed amended pleading be attached to the motion.)  The request in Emrich's response brief, as raised, is not sufficient.  However, no schedule has been set in this case, and, while the Court has dismissed some claims, it has not always done so for

the reasons Defendants argued.  Nor is it clear to the Court that amendment would be futile.  Therefore, Emrich may file a motion to amend within 14 days of this order.  If no amendment is granted, the Court will consider whether to decline to exercise supplemental jurisdiction over the remaining state-law claims.

## Conclusion

IT IS THEREFORE ORDERED that Defendant City of Pawhuska's *Motion to Dismiss* (ECF No. 14) is GRANTED IN PART AND DENIED IN PART as follows:  the Court DISMISSES WITHOUT PREJUDICE Plaintiff's claims under Section 2 of the Sherman Act, the Oklahoma Antitrust Reform Act,  and 42 U.S.C. § 1983, as well as the claim for breach of contract under the Airport Hangar Lease.  The motion is denied as to all other claims.

IT IS FURTHER ORDERED that Defendant Pawhuska Municipal Airport Authority's *Motion to Dismiss* (ECF No. 15) is GRANTED IN PART AND DENIED IN PART as follows:  the Court DISMISSES WITHOUT PREJUDICE Plaintiff's claims under Section 2 of the Sherman Act, the Oklahoma Antitrust Reform Act, and 42 U.S.C. § 1983, as well as all claims for breach of contract.  The motion is denied as to all other claims.

IT IS FURTHER ORDERED that Defendant Pawhuska Municipal Airport Advisory Committee's *Motion to Dismiss* (ECF No. 16) is GRANTED.  All claims against the Pawhuska Municipal Airport Advisory Committee are DISMISSED WITHOUT PREJUDICE.

The following claims remain in this case:  Count IV (Breach of Contract – First Agreement) as to Defendant City of Pawhuska only, and Count VI (Promissory Estoppel) as to Defendant City of Pawhuska and Defendant Pawhuska Municipal Airport Authority.

Plaintiff may file a motion to amend its complaint by November 6, 2025.

ORDERED this 23rd day of October, 2025.

Susan E. Huntsman, Magistrate Judge
United States District Court